IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

INFINITY AUTO INSURANCE
COMPANY,

    Plaintiff,

       v.

JOSEPH WHIGHAM and ROBERT
WHIGHAM,

    Defendants.

                           CV 113-214

## O R D E R

Presently before the Court is Plaintiff Infinity Auto Insurance Company's ("Infinity") Motion for Summary Judgment. (Doc. 43.) On December 1, 2012, Defendant Joseph Whigham ("Joseph") sustained a serious injury to his leg when a vehicle collided with his motorcycle, which he was in the process of purchasing from a friend. This case arises out of Joseph's subsequent demand for uninsured motorist benefits pursuant to an automobile policy ("the Policy") issued by Infinity to his father, Defendant Robert Whigham ("Robert"). Infinity seeks to rescind the Policy on the ground that Robert procured it through misrepresentation when he failed to disclose that Joseph was a resident of his household. Infinity alternatively contends that it owes no coverage to Joseph because it received notice of the claim over five months after the accident occurred, well beyond the thirty-day window required by the Policy.

For the reasons set forth herein, the Court **GRANTS** Infinity's Motion for Summary Judgment and **ADJUDGES** the Policy void *ab initio*.

## I.  BACKGROUND

### A.  Joseph Whigham's Living Arrangements

In 2009, during Joseph's senior year of high school, Joseph moved into his father's home on a permanent basis upon transfer of physical custody between his parents. (R. Whigham Dep., Doc. 56, at 28-29, 51; J. Whigham Dep., Doc. 44-2, at 14-15, 20.) At that time, Joseph moved all his belongings to his father's house and thereafter had no intention to move back in with his mother. (R. Whigham Dep. at 30; J. Whigham Dep. at 14-15, 19-21, 36, 44.) Nevertheless, for convenience, Joseph continued to use his mother's mailing address at 1178 Walton's Trail as his legal address since he "had been at his mom's house so long." (J. Whigham Dep. at 22, 35-36; see also R. Whigham Dep. at 31 (explaining that Joseph's mother has "always handled his affairs" as far as school, business, taxes, and other paperwork, and "there was no need to change any of that" with respect to his address).)

In 2010, while living with his father, Joseph graduated from high school and volunteered for active duty with the National Guard. (J. Whigham Dep. at 15, 22-23.) In August 2010, he moved to Fort Leonard Wood, Missouri for training. (Id. at 26.) Joseph returned to his father's home in December 2010 at the conclusion of training, and two weeks later he enrolled at Armstrong State

2

University ("Armstrong") in Savannah, Georgia. (Id. at 25-26.) Joseph lived in a dorm at Armstrong during the semester, but would return to his father's home every other weekend and permanently returned during the summer of 2011 after breaking up with his girlfriend. (Id. at 29-30, 33.) Joseph would stay at other places — with an aunt, cousin, or friend — for a night or two, but according to his father, "he didn't *live* anywhere else." (R. Whigham Dep. at 34-35 (emphasis added).) During the time Joseph was away at training in Missouri and at Armstrong in school, Joseph lived at Robert's house, kept a bedroom there, and kept all his belongings there. (J. Whigham Dep. at 26, 28-32; R. Whigham Dep. at 34, 36.)

In the fall of 2011, immediately before Robert applied for insurance with Infinity, Joseph enrolled at Georgia Southern University in Statesboro, Georgia and moved into an on-campus apartment with his cousin. (J. Whigham Dep. at 32-34.) Joseph returned to Augusta every weekend and stayed with his father. (Id. at 35, 37, 42-44; see also R. Whigham Dep. at 36-37.) Robert kept all of Joseph's belongings and maintained Joseph's bedroom. (J. Whigham Dep. at 45.) Joseph likewise spent the holiday break at his father's house. (Id. at 36.) According to Robert, Joseph was "doing his college thing" and described the living arrangement as one where Joseph was able to "come home if he wanted or if he had a weekend that he wanted to come home." (R. Whigham Dep. at 37-38.) Similarly, Joseph testified there were no other place he would stay

overnight on a regular basis besides his father's house when he came to Augusta (J. Whigham Dep. at 46, 48) and that he "always lived in Augusta" but went back and forth to college (id. at 50).

In the spring of 2012, Joseph dropped out of his classes, but kept his Statesboro apartment and job. (Id. at 41-42.) Thus, throughout the spring and summer, Joseph would stay in Statesboro when he was working, but would go "home" to his father's house when he was not. (Id. at 41-43.) Joseph did not re-enroll at Georgia Southern in the fall of 2012, but was still "back and forth between [his] dad's and Statesboro." (Id. at 45.) On November 23, 2012, Joseph formally withdrew from school when his father determined that "he really wasn't in college" and moved back in with his father full-time. (Id. at 55-58; R. Whigham Dep. at 40.) Joseph moved some of his belongings from Statesboro to Robert's house prior to that date, but by November 23, 2012 he moved "all the way back in." (J. Whigham Dep. at 58.) Eight days later, a motorist collided with Joseph's motorcycle as he returned to his father's home after stopping by to see his mother. (Id. at 51-53, 60.) When Joseph left the hospital after a two-week stay, he went to his father's house. (Id. at 65.) Once he recovered from his injuries, Joseph enrolled in truck driving school in Cedar Rapids, Iowa. (Id. at 7-8.) Upon graduation, he became an over the road or long-haul driver and thus returned to Augusta only occasionally. (Id.; R. Whigham Dep. at 91-92.)

Throughout the two years that he spent in college, Joseph used money from the military, various jobs, and financial aid to pay his own way; Robert did not financially support Joseph, but rather occasionally sent him off with a bag of groceries or extra money for food. (R. Whigham Dep. at 37, 39; J. Whigham Dep. at 31.) Joseph purchased and insured his own transportation. (J. Whigham Dep. at 39, 39, 41.) Accordingly, Robert never allowed Joseph to drive his vehicles. (Id. at 69; R. Whigham Dep. at 46-47, 55.)

## B.  Robert Whigham's Application for Insurance

Agent Melissa Dees of the Donald H. Bailie Insurance Agency ("the Bailie Agency") contacted Robert in August 2011 to requote his auto insurance, as the Bailie Agency had been unable to place Robert's policy the year prior due to his driving record. (Dees Dep., Doc. 50-2, at 37-38.) She obtained quotes from several companies and reported the rates to Robert on August 19, 2011 via telephone. (Id. at 40.) On September 12, 2011, Robert came to the Bailie Agency offices and formally applied for automobile insurance with Infinity. (Id. at 12, 41; R. Whigham Dep. at 43.) He sought to insure three cars and identified himself as the only driver and only household resident. (Norman Aff., Doc. 43-2, Ex. A ("Auto Application"), at 1; Dees Dep. at 18, 36-37, 39-40, 47-48.)

Specifically, Infinity's application asked for the identity of "[a]ll persons age 14 and older, LICENSED OR NOT, who reside with the applicant, and any other drivers of the vehicle(s) on this

application." (Id.) Robert also executed a "Fraud Warning" in conjunction with his application. (Id. at 4.) On this document, Robert certified:

> I have listed on this application all persons age 14 or older, licensed or not, who reside with me and all other drivers who may operate my auto(s) on a REGULAR or OCCASIONAL basis. *This includes children away from home or away at school*. I understand it is my obligation to report to Infinity any change in driving status for any person currently listed, added on my policy, residing in my household, or who operates my auto(s).

(Id. (emphasis added).)

Ms. Dees walked through the entire application with Robert, as is her practice, and Robert had the opportunity to review the completed application before signing it. (R. Whigham Dep. at 68-69; Dees Dep. at 46-48.) Robert testified, however, that he did not review the application before he signed it. (R. Whigham Dep. at 68-69.) Instead, he merely signed where Ms. Dees pointed and wrote a check for the premium. (Id.)

Ms. Dees testified that she was not notified at any time prior to June 2013 that Joseph was a resident of his father's household. (Dees Dep. at 50.) Although Robert applied for life insurance through the Baillie Agency around the same time that he applied for the instant automobile policy, he merely identified Joseph as a contingent beneficiary and gave 1178 Walton's Trial — the mother's address — as Joseph's address. (Id. at 12-13, 17, 42-45.) She further testified that it was in her financial interest to identify

Joseph on the Policy application, as the additional premiums would have resulted in an increased commission.  (Id. at 49-50.)

On the other hand, Robert testified that he had a lengthy conversation with Ms. Dees about his son when selecting coverage options.  (See R. Whigham Dep. at 53-54; 59-63; 76-77.) Specifically, when Ms. Dees asked whether he had any "children living at home . . . or something to that effect," Robert purportedly told Ms. Dees, "I have a son, he lived with me, he's off in the military, off in college, and doesn't drive my vehicles."  (Id. at 60, 63.)  Although Robert couldn't remember "getting into details" with Ms. Dees about Joseph's living arrangements, he recalled informing her that Joseph "goes to college and comes home."  (Id. at 61.)  With this information, Ms. Dees purportedly told Robert that Joseph did not need to be listed on the policy, but warned him that if Joseph did drive Robert's vehicles, Joseph would not be covered.  (Id. at 60, 61, 63, 76, 77.)

Relying on the information in Robert's application, Infinity issued Policy # 110-45711-3536-001 to Robert on September 15, 2011, which included $100,000 per person uninsured motorist coverage. (Norman Aff. ¶ 6.)  On September 30, 2011, Debora Linneman, an employee of URI Information Services ("URI"), conducted a verification interview with Robert via telephone.  (Linneman Dep., Doc. 45, at 16-18 & Ex. 1.)  During this interview, Ms. Linneman asked Robert the following questions, to which he answered "no":

1. "Are there any other household members with a driver's license?" (Linneman Dep. at 25, 50); and

2. "Are there any children attending school away from home?" (Id. at 27, 42, 51.)

Ms. Linneman explained that if Robert had conveyed any additional or "unusual" information about his son or his son's residence, it would have been entered simultaneously into a comment box and reflected in the URI documents. (Id. at 10-12.) Ms. Linneman made no such notes during Robert's interview. (Id. at 25-28, 53.) URI provided the information gathered during the interview to Infinity's underwriters, who then compared it to the insured's application and reevaluated the risk where material differences appeared. (Norman Aff. ¶¶ 22, 23.) As the information collected during the interview matched Robert's application, Infinity made no changes to his policy or premium. (Id. ¶ 24.)

Jerry Norman, an underwriter and Policy Services Supervisor for Infinity, averred that the presence of "additional residents in a household is material to [Infinity's] decision . . . whether to issue a policy of auto insurance[] and constitutes an increased risk." (Id. ¶ 16). Accordingly, Mr. Norman further declared that "Joseph's Whigham's residence in Robert Whigham's household . . . constitute[d] an increased risk to Infinity." (Id. ¶ 15). "In light of Joseph Whigham's age and the number of cars insured on the policy, knowledge of Joseph Whigham's residence would have influenced [Infinity's] decision to insure the risk and materially affected the premium charged to Robert Whigham." (Id.

¶ 20). Indeed, "Infinity would not have issued the policy at the premium rate," but rather would have charged Robert an additional $1,522 in premiums during the period spanning from September 15, 2011 to March 15, 2013. (Id. ¶¶ 18, 19.) This testimony echoed that of Ms. Dees, who stated that for any of the fifteen insurance companies with which she did business, additional drivers *and* "anybody . . . that's living in your house has to be listed on your policy." (Dees Dep. at 34.) This disclosure may garner an additional premium, especially with a "youthful male driver" who is statistically more likely to have accidents. (Id. at 35-36; 49-50.) To mitigate any premium increase due to an individual's resident status, however, after disclosure the insured can execute an exclusion form, which precludes a given resident from operating the insured's vehicles and exempts them from coverage under the policy. (Id.)

Infinity received no declaration from any source prior to his motorcycle accident on December 1, 2012 that Joseph kept a bedroom at Robert's house, attended college away from home, and came home on the weekends to spend the night. (Norman Aff. ¶¶ 5, 13, 14; R. Whigham Dep. at 66, 75-76; O'Shaughnessy Dep., Doc. 49-1, at 36.)

## C. Applicable Policy Language

Joseph's medical expenses exceeded $84,000 (J. Whigham Aff., Doc. 47-1, ¶ 3), but he collected only $50,000 as a result of the accident: $25,000 from the motorist's liability carrier and $25,000

in uninsured motorist benefits from his father's motorcycle carrier. (Id. ¶¶ 3, 5.) Thus, Joseph seeks to access the additional $100,000 in uninsured motorist ("UIM") coverage available under his father's automobile policy with Infinity. Whether Infinity's UIM coverage extends to Joseph under the contract, however, is not at issue.[1] Rather, Infinity claims (1) the policy as a whole is void *ab initio* due to Robert's failure to disclose Joseph's existence or residency during the application process, or (2) it had no obligation to provide coverage because the Whighams failed to satisfy the condition precedent of prompt notice.

The Policy issued to Robert addresses fraud and misrepresentation in the following way:

> The statements made by you in the application are deemed to be representations. If any representation contained in the application is false, misleading, or materially affects the acceptance or rating of the risk by us, by either direct misrepresentation, omission, concealment of facts, or incorrect statements, this policy will be void from its inception.

(Norman Aff., Ex. B ("Personal Auto Policy"), at 19 ("Fraud Clause").) The Policy also provides that Infinity may "void [the] policy or deny coverage for fraud or misrepresentation even after

---

[1] Infinity does not contend, for example, that Part C, Exclusion 7(a) of the Policy — which precludes UIM coverage for "bodily injury or property damages resulting from the ownership, maintenance, or *use* of . . . any vehicle with . . . *less than four wheels*" — applies. (Personal Auto Policy at 10 (emphasis added).)

the occurrence of an accident or loss." (Id.) The Policy further reserved, consistent with Georgia law,

> the right to void [the] policy from its beginning if we determine that you have provided incomplete, inaccurate or false information in your application. Your misrepresentations, omissions, concealments of fact or incorrect statements must be either fraudulent; material either to our acceptance of the risk or hazard, or we, in good faith, would either not have issued this policy or would not have issued this policy in as large an amount or at the premium rate charged or would not have provided coverage with respect to the hazard insured against and resulting in the loss if we had known the true facts.

(Id. at 20 ("Rescission Clause").) This reiterates the language appearing in the heading of the Application's "Fraud Warning":

> IN ACCORDANCE WITH APPLICABLE STATE LAW, INFINITY MAY, AT ITS DISCRETION, REJECT THE APPLICATION, RESCIND THE POLICY, LIMIT COVERAGE OR CHARGE AN INCREASE IN PREMIUM FOR WHICH YOU ARE RESPONSIBLE, IF ANY PERSON HAS (1) PROVIDED INFORMATION WHICH IS FALSE, MISLEADING, OR INACCURATE, OR (2) FAILED TO DISCLOSE INFORMATION WHICH, IF PROPERLY DISCLOSED, WOULD AFFECT INFINITY'S DECISION TO WRITE THIS POLICY OR CHANGE THE TERMS THEREOF OR THE PREMIUM CHARGED.

(Auto Application at 4.) By signing the Fraud Warning, Robert certified he understood that:

> [a]s state law allows, no coverage is provided and the policy shall be null and void from inception . . . if any information in this application is false, misleading, or would materially affect the policy premium or acceptance of the risk by the Company[.]

(Id. ¶ 7(a).)

## II.  STANDARD OF REVIEW ON SUMMARY JUDGMENT

The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259, 1260 (11th Cir. 2004); FED. R. CIV. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed a genuine issue as to the material facts of its case.  Clark v. Coats & Clark, Inc. ("Clark I"), 929 F.2d 604, 608 (11th Cir. 1991).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute of those material facts "is 'genuine' . . . [only] if the evidence is

such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at 255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989).

The Clerk gave Defendants appropriate notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 46.) Thus, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired and the motion is now ripe for consideration.

### III.  DISCUSSION

Georgia law provides that "[a]ll statements and descriptions in any application for an insurance policy . . . shall be deemed to be representations." O.C.G.A. § 33-24-7(a); see also Personal Auto

13

Policy at 1 (tracking same language). Misrepresentations, omissions, concealed facts, and incorrect statements made by an insured during negotiations for an insurance policy, however, will bar recovery only where such representations are (1) fraudulent; (2) material either to the acceptance of the risk or to the hazard assumed by the insurer; or (3) the insurer in good faith would not have issued the policy in as large an amount, at the premium rate applied for, or at all if the true facts had been known. See O.C.G.A. § 33-24-7(b).

Thus, to avoid coverage under this statute,[2] the insurer need not prove that the insured made the offending representation with intent to deceive or even knowledge of its falsity. See Perkins v. Am. Int'l Specialty Lines Ins. Co., 486 B.R. 212, 217-18 (N.D. Ga. 2012) (citing Home Indem. Co. Manchester, N.H. v. Toombs, 910 F. Supp. 1569, 1574 (N.D. Ga. 1995)). Indeed, "it is immaterial whether the applicant acted in good faith in completing the application." White v. Am. Family Life Assurance Co., 643 S.E.2d 298, 300 (Ga. Ct. App. 2007) (citations omitted). Rather, "the insurer need only show that the representation was [objectively] false and that it was material." Pope v. Mercury Indem. Co. of Ga., 677 S.E.2d 693, 696-97 (Ga. Ct. App. 2009) (citing White, 643

---

[2]    As uninsured motorist insurance coverage can be rejected, it is not a form of mandatory insurance coverage to which the defense of misrepresentation would be precluded as a matter of public policy. Platt v. Nat'l Gen. Ins. Co., 423 S.E.2d 387, 392 (Ga. Ct. App. 1992).

S.E.2d at 300). "A material misrepresentation is one that would influence a prudent insurer in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." Id. at 697 (citing Jackson Nat. Life Ins. Co. v. Snead, 499 S.E.2d 173, 176 (1998)). "[O]rdinarily[,] the question of materiality is for the jury, [but] where the evidence excludes every reasonable inference except that the misrepresentation was material, the issue becomes a question of law for the court." Id. (internal punctuation omitted).

The Whighams do not challenge in their brief or provide any evidence to controvert Infinity's supported assertions that (1) the representations at issue were material and (2) that Infinity would not have issued the Policy to Robert at the premium rate applied for had Joseph's residency been disclosed. This failure to respond indicates that they do not oppose Infinity's motion in these respects. See LR 7.5, SDGa; see also Northington v. Dreamland Amusements, Inc., No. CV 111-014, 2012 WL 1656919, at *5 (S.D. Ga. May 10, 2012) (citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986) for the proposition that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned). Thus, the sole issue before the Court is whether Joseph "reside[d] with" Robert at the time of application such that Robert's failure to disclose constituted a misrepresentation of fact.

"[Q]uestions of domicile and residence are mixed questions of law and fact and are ordinarily one[s] for a jury to determine." Daniel v. Allstate Ins. Co., 660 S.E.2d 765, 767 (Ga. Ct. App. 2008) (quoting Baldwin v. State Farm Fire & Cas. Co., 590 S.E.2d 206, 207 (Ga. Ct. App. 2003)). In deciding whether a relative is a resident of the named insured's household, courts generally consider both the language of the insurance policy and "the aggregate details of the family's living arrangements." Id. (citation omitted); see also Burdick v. GEICO, 626 S.E.2d 587, 589 (Ga. Ct. App. 2006). "Of critical importance to this analysis is whether the family members have established and maintained separate households under different management." Burdick, 626 S.E.2d at 589 (citing State Farm Fire & Cas. Co. v. Goodman, 576 S.E.2d 49, 52 (Ga. Ct. App. 2002)). A relative's household relationship with the insured may end where he has demonstrated intent to remove himself from the household and has taken some action toward doing so, or vice versa. Goodman, 576 S.E.2d at 52 (citing Keene v. State Farm Mutual Auto. Ins. Co., 152 S.E.2d 577, 578 (Ga. Ct. App. 1966)). An individual may have more than one residence for purposes of insurance coverage. Daniel, 660 S.E.2d at 769 (citing Baldwin, 590 S.E.2d at 207 and Travelers Ins. Co. v. Mixon, 162 S.E.2d 830, 831 (Ga. Ct. App. 1968)).

## A.    The Policy Language

Unfortunately, Infinity's policy language is not elucidating: it defines "resident" as "any person living in your household, other than you or a relative," and "relative" is defined as "any person related to you . . . who lives in your household, whether or not temporarily living elsewhere." (Norman Dep., Ex. B ("Georgia Amendatory Endorsement"), at 1.) By this definition, Joseph is *not* a "resident" in Robert's household, but rather a "relative." Robert's application, however, did not ask him to disclose "relatives."

The language in the Policy Application, however, is more straightforward and by its own terms becomes part of the Policy. (See Auto Application at 4 ("I hereby apply to the Company for a policy of insurance as set forth in this application on the basis of the statements contained herein. By signing below I agree that this application becomes a part of my policy and is a legal document.").) On the first page, the Application requests that the insured identify two categories of individuals: (1) "[a]ll persons age 14 or older, LICENSED OR NOT, who *reside* with the applicant, *and*" (2) "any other drivers of the vehicles(s)." (Auto Application at 1 (emphasis added).) Alone, this provision provides no additional clarity as to who is a "resident" or what it means to "reside." As to the "who," however, the Fraud Warning provides a hint. There, the Policy Application similarly requires the insured to certify that he has listed two categories of individuals: (1)

"all persons age 14 or older, licensed or not, who *reside* with [the insured] *and*" (2) "all other drivers who may operate [the insured's] autos on a REGULAR or OCCASIONAL basis." (Auto Application at 4, ¶ 1 (emphasis added).) The next sentence contains the following modifier or descriptor: "This includes children away from home or away at school." (Id.)

The Whighams contend this modifier creates ambiguity, and a "fair interpretation" of the language indicates that Robert only was required to "disclose 1. resident relatives and 2. all other persons who may occasionally or regularly drive his autos including children away from home or away from school." (Defs.' Resp. at 11.) They emphasize that "[i]n construing an insurance policy, the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." (Id. at 10.) Mason v. Allstate Ins. Co., 680 S.E.2d 168, 171 (Ga. Ct. App. 2009).

First and foremost, the Court notes that the Whighams' ambiguity argument is misplaced: under O.C.G.A. § 33-24-7(b)(2) and (3), "it is immaterial whether the applicant acted in good faith in completing the application." White, 643 S.E.2d at 300. Whether Robert was unsure about what the above-described language meant does not alter the Court's analysis of whether his answers to the questions on the Application were *objectively* false. Indeed, even if the Court construes the language as the Whighams urge, there remains the possibility that

18

Joseph was a "resident relative" such that he should have been disclosed.

Even so, the Court finds that the phrase "This includes children away from home or away at school" is not ambiguous on its face: policy language "is genuinely ambiguous only when the phrasing . . . is so confusing that an average policyholder cannot make out the boundaries of coverage." State Auto Prop. & Cas. Co. v. Henderson, No. 5:11-CV-499 MTT, 2013 WL 949877, at *3 (M.D. Ga. Mar. 11, 2013) (citing Ga. Baptist Children's Home v. Essex Ins. Co., 427 S.E.2d 798, 800 (Ga. Ct. App. 1993)). Nor is the modifier language capable of the construction suggested by the Whighams. "Words, like people, are judged by the company they keep." Anderson v. Se. Fidelity Ins. Co., 307 S.E.2d 499, 500 (Ga. 1983). The modifier itself contains no words of qualification or limitation. And when gauged by the words surrounding it, the preceding sentence of the Fraud Warning that the modifier describes uses the word "and" in its *conjunctive* form, implying equal grammatical rank of its parts. See THE CHICAGO MANUAL OF STYLE § 5.194 (16th ed. 2010). Unlike the disjunctive "or," "and" does not indicate that an alternative choice exists or imply that an election must be made.[3] Thus, the language in and structure of the Fraud Warning unambiguously indicates that "children away from home or away at school" applies to *both* categories of individuals the

---

[3] See Haugen v. Henry Cnty., 594 S.E.2d 324, 326 (Ga. 2004); In re J.C.W., 734 S.E.2d 781, 789 (Ga. Ct. App. 2012).

Application seeks to identify — (1) those who *reside* with the insured *and* (2) other drivers of the insured's vehicles. Thus, under the Policy such children can "reside" with the insured notwithstanding their temporal or geographic absence, which echoes the common law principle that an individual may have more than one residence for purposes of insurance coverage. See Daniel, 660 S.E.2d at 769 (citations omitted).

**B.    The Aggregate Details of the Whighams' Living Arrangements**

The Policy language alone, however, does not resolve what it means to "reside" in this case. Georgia courts have held that the ordinary and accepted meaning of "resident" and other similar language in insurance disputes pertains to "one who physically maintains permanent or frequently utilized living accommodations." See Daniel, 660 S.E.2d at 769 (citations omitted); Rainey v. State Farm Mut. Auto. Ins. Co., 458 S.E.2d 411, 412 (Ga. Ct. App. 1995) (noting the phrases "lives with," "resides with," "is a member of the household," "or is a resident of the household" are sufficiently similar to warrant analysis under the same standard). Thus, the Court turns to examine the nature and extent of Joseph's living arrangements in the aggregate at the time of Robert's application, keeping in mind the inclusive Policy language addressing "children . . . away at school."

Joseph describes his living arrangements as follows: beginning in 2009, Joseph had "nowhere else to go" after some disagreements

arose with his mother, and he intended the move to his father's home to be *permanent*. (J. Whigham Dep. at 18-20.) Up until August 2010 when Joseph left for military training, he went to and from school or work *from his father's house*. (Id. at 21, 24.) Beginning in January 2011, Joseph generally spent Sunday nights through Friday on campus, close to his classes and place of employment. (See id. at 32, 35, 37, 42-46, 50, 56.) He spent *most* Saturday nights, Sundays, and holidays *at his father's home*. (Id.; see also id. at 30, 36.) Throughout the period Joseph was away from home or at school, he had his own bedroom at his father's home (id. at 21, 26, 30, 45, 59), understood that his father's rules governed (id. at 21-22, 32), and kept all his ancillary belongings at his father's home (id. at 29, 35, 45). He returned to his father's home on a full-time basis the day after Thanksgiving in 2012. (Id. at 56-57, 59.) On the day of the accident, he was driving *home* to his father's house from a visit to his mother. (Id. at 53, 60.) By his own admission, Joseph's plan was "to live with [his] dad until he finished college or got [his] own place or something like that." (Id. at 31-32.) He repeatedly stated that he "always lived in Augusta," even if he was working or in school, and that he "was always living with [his] dad." (Id. at 50, 55.)

Robert — the insured — described Joseph's living arrangements as follows: Robert "knew [Joseph] was never going back" to his mother's house. (R. Whigham Dep. at 28, 30, 31, 35-36.) "There was never an option for him move back" after his mother "kicked him

out" and put him "on the curb with all his stuff." (Id.) Thus, from 2009 until the Joseph started attending Armstrong in 2011, Joseph "was living at [his] house." (Id. at 33, 34.) Thereafter, even though Joseph was "doing his college thing," Joseph could "come *home* if he wanted to or if he had a weekend that he wanted to come *home*." (Id. at 38 (emphasis added).) Joseph had access to Robert's entire house, Robert kept Joseph's bedroom intact, and kept all of Joseph's belongings there. (Id. at 33, 34, 42.) Finally, Robert encouraged Joseph to come back *home* when he began to struggle at school: "[h]e could come there and stay, go to college, and [Robert] would pay for everything." (Id. at 49.) Joseph heeded his father's advice, moved back to Augusta, and from then on consistently stayed at Robert's house at night. (Id. at 42.)

It cannot be disputed that Joseph spent considerable time at his father's home during the course of pursuing his college degree. Of course, "[m]ore than mere physical presence and transient visitation is required to make a person a resident of a household." Rainey, 458 S.E.2d at 413 (citing Sanders v. Ga. Farm Bureau Mut. Ins. Co., 355 S.E.2d 705, 706 (Ga. Ct. App. 1987)). Joseph's and Robert's respective intent in this case is critical, and more importantly, there is no genuine issue of material fact as to what those intentions were. After his mother transferred physical custody to Robert in 2009, Joseph intended to live exclusively with his father until he *finished* college or until he became

22

economically independent and able to move out on his own. (See J. Whigham Dep. at 31-32.) "This intent to live in his father's house, even if only for the time being, was sufficient to establish his residence there." Sanders, 355 S.E.2d at 706 (citing Smiley v. Davenport, 229 S.E.2d 489, 491 (Ga. Ct. App. 1976)).

Similarly, Robert understood that Joseph had *no other place to go*. Robert made sure to have space for Joseph during at least one move to a new home. (See J. Whigham Dep. at 26-27.) He expressed no plan to kick Joseph out of the nest the instant he graduated from high school in 2010, enlisted in the National Guard, or enrolled in college. (Cf. R. Whigham Dep. at 28-30, 34-38 with id. at 92 (describing, for the first time, that Joseph is "on his own" since taking up truck driving).) Instead, he maintained an open door policy: Joseph's regular weekend visits throughout the school year were welcome and did not require permission (see id. at 38); Joseph was allowed to enjoy each part of the living facilities (id. at 32); and at no point did the living arrangement entail payment of rent or utilities to Robert, even once Joseph returned permanently in November 2012 (see id. at 40; J. Whigham Dep. at 45.)

The Court does not ignore the fact that Joseph did pay rent and utilities with his own funds for campus accommodations and used his mother's mailing address on legal documents. But these facts are only dispositive in a vacuum, especially given the basic legal maxim that "[a] man may have several residences." Baldwin, 590

S.E.2d at 207 (citation omitted); see also Daniel, 660 S.E.2d at
769.   Considering *all* the facts relevant to Joseph's living
situation — from the day he moved in with his father in 2009 until
he enrolled in an out-of-state trucking school in 2013 — there is
no genuine issue of material fact as to whether Joseph was a
resident of Robert's home at the time Robert applied for insurance
with Infinity in 2011.   Robert maintained "frequently utilized
living accommodations" for Robert throughout that period, see
Daniel, 660 S.E.2d at 769, and Joseph unequivocally intended to
stay there "until he finished college or got [his] own place" (J.
Whigham Dep. at 31-32).   Joseph did not take sufficient action to
remove himself from his father's household, nor did Robert.   Cf.
Rainey, 458 S.E.2d at 413 (finding the father demonstrated an
intent to remove himself from his daughter's household when he
moved out of her home and into his own apartment, as corroborated
by cancelled rent checks, information in his tax returns which
identified his daughter as *not* living with him, and his admission
that he "lived" in the apartment despite spending several nights
per week with his daughter to be close to work); Sanders, 355
S.E.2d at 706 (finding the son ended his membership in his mother's
household when he moved to his father's residence to be close to
work, subsequently became engaged, and diminished the frequency of
his weekend visits to mother's home); Cotton States Mut. Ins. Co.
v. McEachern, 218 S.E.2d 645, 647-48 (Ga. Ct. App. 1975) (finding
the son ended his membership in his father's household when he

moved with his wife to a home a mile and a half away, did not claim to be living in his father's home, and believed himself to be "on his own" and the head of his own household despite his father's contribution of the down payment, all furnishings, and daily meals).

Accordingly, Robert's failure to disclose Joseph on the application as a "resident" or someone who "resides" with him — which included "children away from home or away at school" — constitutes a misrepresentation of fact.[4] Robert's objectively false "no" answer to URI's subsequent stand-alone verification question "Are there any children attending school away from home?" only bolsters this conclusion. (Linneman Dep. at 27, 42, 51.) Infinity thus has proven all that the law requires, see Home Indem. Co. Manchester, 910 F. Supp. at 1574, and is entitled to rescind the Policy under its express terms. Having adjudged the Policy to be void *ab initio*, the Court declines to address Infinity's alternative arguments in defense of coverage.

---

[4]     Robert points the finger at Ms. Dees, emphasizing that (1) "she knew as a result of issuing a prior life insurance policy that Robert Whigham had a son, Joseph Whigham," (2) "knew that resident relatives over 14 years of age had to be disclosed" if they met certain residency or automobile use requirements, and (3) notwithstanding the information she received from Robert, Ms. Dees "confirmed that Joseph did not have to be on the policy." (Doc. 52 at 4-5.)   Ms. Dees' actions and/or representations, however, are irrelevant to the Court's analysis of whether rescission, grounded in allegations of material misrepresentation, is the appropriate remedy in this case.   It does not matter if Robert, pursuant to Ms. Dees purported advice, believed in good faith that his son did not meet the definition of "resident" or did not have to be included on the policy.   "O.C.G.A. § 33-24-7(b) does not require that an insurer prove the insured's knowledge of . . . the falsity of the misstatement or omission at issue."   Pope, 677 S.E.2d at 698 (citing White, 643 S.E.2d at 300).   Accordingly, "it is immaterial whether the applicant acted in good faith in completing the application."   White, 643 S.E.2d at 300.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Infinity's Motion for Summary Judgment (Doc. 43) and **ADJUDGES** Policy # 110-45711-3536-001 to be void *ab initio*. The Court **DIRECTS** the Clerk to enter judgment in favor of Infinity Auto Insurance Company.

Within **FOURTEEN DAYS** of the date of this Order, the parties **SHALL** file either: (1) supplemental briefs to address what portion of the tendered premiums, currently on deposit with the Registry of Court, should be refunded to the insured (see Compl., Doc. 1, ¶ 35), if disputed; or (2) a consent motion to disburse the interpleaded funds as agreed.

**ORDER ENTERED** at Augusta, Georgia, this 20th day of March, 2015.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA